Immigration and Customs Enforcement, Mr. Shear. Thank you, Your Honor. May it please the Court. My name is Howard Shear. I represent the four supervisory appellants in this case, Julie Myers, John Torres, Scott Weber, and Bartolomeo Rodriguez. They are appealing all four, the denial of... Do you want to request some time for rebuttal? I do. Two minutes. I'm sorry, Your Honor. Thank you for reminding me. That request will be granted. All four of the appellants appeal the denial of qualified immunity, and Myers and Torres appeal the question of the denial of a motion to dismiss based on personal jurisdiction. As to the qualified immunity, the clear case that is the leading case is the Iqbal case, which sets forth the pleading requirements. This Court dealt with this most recently in a slightly different context, 1983, but in the Santiago v. Warminster Township case, in which the Court instructed that you should look first at the conclusory allegations, weed them out, and then look at the actual factual pleadings. As a basic matter, is it your position that there is no supervisory responsibility at all after Iqbal? There is no supervisory liability in that concept. There is the liability of supervisors for their personal involvement. But they can't be liable by reason of what subordinates do, even if they have acquiesced in it, have knowledge, and failing of training or oversight. Is that your position? Correct, Your Honor. Did Iqbal really change that? Well, it did. Or did they really just state what the law has been? Well, the Court went further than that because it said, and I know this was in the context I mean, you're dealing with the Attorney General of the United States in Iqbal, and you're dealing with the Director of the FBI. Well, and here we're dealing with Julie Myers, who was an Assistant Secretary. I understand that. But Iqbal was dealing with the two highest, arguably the two highest law enforcement officials in this country. And in that case, I don't want to yield on that. I think Myers was at the same level as the FBI Director. So there's no distance between those two. And the other four, the other three, Torres was equally high in the Washington headquarters. I mean... But I guess my question is, did Iqbal restate the law, or did Iqbal lessen the scope of the liability of supervisors for their acts, which essentially involved the subordinates? Well, as a general matter, I think it lessened the scope of supervisory liability as a general matter to the point where the Court said supervisors are liable only for their personal involvement. And personal involvement is direct participation. Where did it say direct participation, that it couldn't be... Is there anything in there that says they can't be libelized supervisors by reason of what subordinates do if they acquiesce in it, have knowledge of it, and fail to take any precautions? Well, indeed, the Court talked about the fact that knowledge and acquiescence was insufficient in the context of that case, and then made one other juxtaposition of the arguments made by Iqbal. Iqbal, at one point, said, well, knowledge and acquiescence is sufficient. And the Court said at page 1947 and 48, I believe, in the context of that argument, that that was inconsistent with their prior argument that there is no such thing as respondeat superior liability for supervisors. Wait, wait, wait, wait. There's a clear distinction in our case law that's been longstanding between respondeat superior liability, which is strictly vicarious, and other kinds of liability that gets called supervisory, but which involves knowledge and acquiescence, or a directing of subordinates to do something problematic. Iqbal says there's no such thing as respondeat superior, but the only comment it makes about supervisory liability requiring more than knowledge and acquiescence is in the context of the specific Bivens claim made there, isn't it? Well, that's why I like to say that that's plaintiff's argument here. But if you go just a few sentences earlier, where the Court is discussing the knowledge and acquiescence, it says to argue that knowledge and acquiescence is sufficient in a Bivens action, as opposed to 1983, but in a Bivens action, is inconsistent with the concession that plaintiffs made in the Iqbal case, that there is no such thing as respondeat superior liability of supervisors. Well, why would the Supreme Court quote with apparent approval Dunlop v. Monroe, something that your opponents hit a few times, where as the Supreme Court describes it in its parenthetical, this is indeed in the same zone of the opinion that you're relying on, that a federal official's for intending the discharge of his supportant's duties. That's cited by the Supreme Court, as I said, with apparent approval as a basis for someone to be held liable. What are we to make of that? Well, I think it's, I think that's, if that's what the Court is saying there, and I don't read it the same way, I think what the Court has been saying at 1947 and 1948 is, in particular, the paragraph that begins, respondeat disagrees. He argues that under a theory of supervisory liabilities, petitioners can be liable for knowledge and acquiescence in their subordinate's use of discriminatory criteria to make classifications, or in other words, to eat. And then they say, well, that's not going to be enough, because in this case, it takes purposeful discrimination for this kind of claim. But why don't you focus on the piece I'm trying to get you to look at. You said you don't read it that way. I just quoted it to you. How do you read it? Where is it, Your Honor, in the opinion? It's in the opinion at 1948. It's immediately before Headnote 9. Just before Headnote 9, you'll see the Court goes through a series of cases. It says, based on the rules of our precedents established, respondents correctly concedes that the government officials may not be held liable for unconstitutional congregate of their subordinates under a theory of respondeat superior. They're saying, that's out the window. And then they cite a series of cases, one of which is Dunlop versus Monroe, which has the parenthetical which I've just read and which is quoted at various points in your opponent's briefing. Right. It seems to me that's an odd statement for the Court to make, because neglect, of course, is a tort theory, which wouldn't be supported in a Bivens action. It seems to me Dunlop versus Monroe, which is a very old case here, doesn't adequately state what the Court is saying in this case in Iqbal. But let me move from that. All right. Let's move to another point without having a whole forum here on Iqbal. Let's move to another point here. We're looking at this case. You made an Iqbal-type argument. But in reality, you move for a grant of qualified immunity, move to dismiss it was denied. You're here on that appeal. I'm interested in whether or not the amended complaint sufficiently pleads a constitutional violation and whether or not many of the factual allegations that are contained in the alleged factual allegations contained in this complaint are really conclusions of law that should be disregarded following the Supreme Court's Twombly and Iqbal decisions on those points. Would you address those questions? Yeah. So I think on a narrower basis, in this case, it really only calls for the Court to look at this narrowly. The plaintiffs start out with allegations against Weburn and Rodriguez that are virtually spare or nonexistent in terms of what they actually did wrong. The only thing, the key paragraphs in this case, which I'd urge the Court to look at are paragraph 5 of the second amended complaint, paragraphs 19 to 22, 28 to 32, and then the key paragraphs 144 to 152 titled defendant supervisory responsibility. And in those paragraphs, 144 to 152, there are four paragraphs referring to Weburn and Rodriguez. And the only statements in those paragraphs have to do with, don't say that Rodriguez did anything wrong, only indicates his position in that he either made statements to the media or knew about media reports. None of the media reports, the statements that he would make to the media certainly are lawful. That's part of his job description. So there's nothing wrong there. And otherwise, there's no allegation that Rodriguez did anything wrong. Weburn is the same allegations except one addition. In paragraph 149, they cite a statement that Weburn said, I don't see it as storming a home. We see it as trying to locate someone. But if you look at page 374 of the joint appendix, which has the article where that came from, you can see in that article it's not clear what he was responding to, first of all, when he said that. And number two, he was just making a comment in relation to, I suppose, some question asked by the reporter. But three, a few paragraphs earlier in that same article on page 373 or 374, he stated, we do these operations constitutionally. Our agents are trained in the Constitution and what it requires in order to enter a house. So there's no allegation. The allegations in the complaint, though, are that, in fact, that isn't how it's happening and that there's not just one or two articles, but multiple articles in the press reflecting assertions that they're not following these procedures and that there's an inspector general's from DHS, there's a phone call from the mayor of a city in Connecticut, there's questioning before congressional committees. There are multiple instances in which the supervisors were put on notice. That's the assertion and they, not in the range where you've specifically cited, but earlier in this very lengthy complaint, they talk about these various ways in which the four supervisors, information was out there that they certainly had to know about. That's, in essence, the assertion. So it's not, in that respect, I guess, it's not like Attorney General Ashcroft and Director Bush pushed toward these supervisors. Why is that? Why should we view that as conclusory? Well, the knowledge, first of all, none of this knowledge actually works towards either Weber or Rodriguez because they were in New Jersey only. And most of the information regarding these press reports and so forth are either outside the jurisdiction, the lawsuits are outside the jurisdiction, or to the extent they are articles inside New Jersey about conduct in New Jersey, they are press reports concerning arrests, but nothing. Then set those two aside, look at Myers and Torres. Okay. As to Myers and Torres, I would argue that, first of all, with regard to the lawsuits, one of them was dismissed. None of them were ever substantiated. All they amounted to was a scattering of lawsuits in a nationwide program in which Myers supervises about 15,000 employees in a multitude of different programs. Aren't you taking us past plausibility? I mean, I think that's what I would be hearing from the other side, is that they would say, you're making us prove our case at the pleading stage. All we have to do is make it plausible. Well, they're arguing that the notice was basically constructive as opposed to actual because there is no pleading that actually shows that Myers and or Torres. They had to know, it's obvious that, is it so incomprehensible that they had to know when they increased the, to 1,000, the number of arrests everyone had to make, which was about 800% quota that was increased, all of the publicity that was in the newspaper, the complaints, the U.N. report. What they're saying is that, as a matter of fact, they had to know that all this was going on and they did nothing to cure it. They let it go on. May I continue, Your Honor? I've seen my report. We will give you an additional five minutes. So with respect to that argument, first of all, again, this is a nationwide program in which there were only a scattering of lawsuits, some of which, none of which wound up with a finding of any constitutional violation and one, in fact, the Arias lawsuit in which Myers and Torres were dismissed. And number two, much of the media reports were anecdotal and they were certainly unsubstantiated and newspaper reports, the courts have always understood to be hearsay. So to say that, and again, we're here focusing not on official capacity, whether Myers and Torres had some duty generally with respect to the program to act on a scattering of information, but whether they are personally liable for the conduct of a scattering of alleged misconduct in which- It's Bivens. We get that. But there is a specific allegation that Torres, I thought there was a specific allegation that he was told and he made a response. Now, I couldn't put my finger right on it. No, you're right, Your Honor. It's with respect to the New Haven mayor. Right. The New Haven mayor called. Okay. How does the New Haven mayor's allegations about what took place in Connecticut have anything to do with what took place in New Jersey? And that's our point. It's an unsubstantiated allegation about something in Connecticut that does not prove notice of any unconstitutional conduct in New Jersey, and therefore certainly isn't plausible that that would give notice of any unconstitutional conduct. The idea is that the whole system was out of control, it was running wild, it was running about the same thing was happening in New Jersey, was happening in Connecticut, happening all over the country. It happens that there was some notice that this thing was going amok and it wasn't controllable. That's the claim. Let me ask you more directly. Of course, under 1983, there's a cause of action for supervisory responsibility if you are aware of it or if you're a supervisor, you let it go. Should it be any difference under a Bivens claim? I mean, why should state officials be treated any differently than a federal official? Is it your position that there's less liability under the Bivens than there is under 1983? Well, of course, 1983 is statutory and has its wording. Bivens, of course, is judicially created and the Supreme Court has kept it very narrow. Well, the question is, is that narrowness any more narrow than under 1983? Under 1983, in order to have supervisory capacity, you've got to show that the supervisor knew of it, did nothing about it, was acquiescent in it. That's what they're trying to... They're making a parallel claim that Bivens has the exact same liability. If something is staring at you in the face, you can't have blind assertion that I never knew it happened. Willful stupidity, so to speak. I understand the question, Judge Collin. In the Bivens, the 1983 cases that you're referring to, plaintiff's site, the amici site, all involved the same conduct by the same or similar agents in the same or similar place repetitively in which... And the courts do not tolerate that or at least give a cause of action under 1983. So if you wanted to say that there was some sort of parallel between the two in Bivens, you don't have the same or similar actors being accused of misconduct, repeated repetitively in the same jurisdiction with respect to this conduct. In fact, we have allegations based on unsubstantiated... Here's willful blindness, that they had to be deaf, dumb, and blind not to know what was going on. There being the complaints, all of the lawsuits, the statements by officials from the Senator from New Jersey and so forth, that you had to know, especially since you increased the quota, that this was going to run amok. Well... Do you agree this is a quota? It's their goals and the statute... Is there a difference? Well, there is.  It's something you hope to achieve. A quota, it may be dealt with differently, that if you don't manage the quota for some reason, there may be some action taken in terms of your evaluation. But goal is the word that's used throughout the Joint Appendix, and I could cite you... But call it a goal. To answer this question, I do want to answer this question, Your Honor. Increasing or vigorous enforcement is merely a statement that the supervisors acted constitutionally. They did what the taxpayers hired them to do, enforce the law. So there's nothing illegal about that allegation in and of itself. And not many of the statements plaintiffs make in their complaint are similarly about lawful objectives. Now, to the extent you want to argue that they must have known because of all these things, let me take you through it. Senator Menendez's statement was after all of these events in New Jersey. So it couldn't have been noticed. And similarly with the rapporteur's statement, an international piece that they cite to, and we have all of this in our brief. The law cases that they allege, I have to take these one at a time because it's important. There were several complaints, three or four or five mentioned in their Second Amendment complaint. None of them, all of them at the time were just unsubstantiated allegations. One case was actually dismissed, the Arias case out of the Eighth Circuit, which Myers and Tories were involved. Some of them were official capacity suits in which the individual defendants aren't served. They're served on the U.S. attorney. So to say they have actual personal knowledge about such suits is not correct. It's conclusory to suggest that they had knowledge of unconstitutional conduct because we're dealing with allegations in the complaint. Again, I'm over my time. May I finish? They're talking about, and the same thing with the- Briefly finish. Many of the newspaper reports were after either two, four, or all of the actions in this case. They all dealt, many of them dealt with arrests. Didn't say anything about unconstitutional conduct. They just reported the arrests. So to say that gave notice is improper as well. All right. Mr. Scherr, we'll have you back for rebuttal. Mr., is it Azmi? Yes, Your Honor. Thank you. Mr. Azmi. Mar Azmi on behalf of Plaintiff Appellees. And we gave Mr. Scherr an additional five minutes. Mr. Williams, why don't you add additional five minutes on to- Thank you, Your Honor. So we represent nine individuals, primarily United States citizens and lawful residents, who were subject to what the district court properly characterized as, quote, a strikingly similar pattern of forced entries and dragnet home searches in violation of their clearly established Fourth Amendment rights. Okay, and those claims are going forward against those individual officials that made the claim, that made the entry into their premises, correct? Yes, Your Honor. There are 31 individual- These four defendants before the court. That's right. And so for these four defendants- They're all part of the same case, right? They're part of the same case. And you just have an appeal from the denial of qualified immunity by these four defendants. That's right. In fact, we have a discovery conference tomorrow with respect to the 31 individual defendants. But with respect to these supervisory defendants, we sue them under long-standing Third Circuit law for their personal involvement in these violations. What long-standing Third Circuit law are you hanging your hat on? Your Honor, cases dating from Cincello v. Fenton's 1986 Bivens failure to train supervisory liability case through to Santiago, under which you can hold a supervisor liable for the acts of subordinates if that supervisor acts with deliberate indifference in establishing and maintaining a policy that causes individuals harm, or if the supervisor has knowledge and acquiescence of a widespread pattern and practice, as alleged here, of constitutional violation. Why don't you go to that? Why don't you go to that allegation of knowledge and acquiescence? Because Mr. Scheer was, at the end, explaining to us that the assertions you've made that they had to be on notice are, they can't be accepted as sufficient. I won't repeat it. You were sitting here. You heard what he had to say. So why don't you take, if you don't mind, go through and tell us why a hearing before Senator Menendez is relevant here, if, as he says, it occurred afterwards, and why a phone call from the mayor in New Haven is relevant to what's going on in New Jersey if there's not information that there are problems in New Jersey. Thank you, Your Honor. I would like to do that. And I first want to put the knowledge and acquiescence allegations in the context of the policy, which we also allege produced deliberate indifference, because I think that's what also makes the knowledge and acquiescence allegations that much more plausible. And so, as Judge Cowen pointed out, we allege that Meyers and Torres adopted a policy requiring an 800% increase in the quota. All right. How does that policy create deliberate indifference? Isn't that good law enforcement? No, Your Honor. Here is why. Because, first, it's not 800% with a corresponding increase in resources. Each individual fugitive operations team has to find 800% more individuals, and they have to do it in the context of a home entry. In fact, in New Jersey, if you added two teams, there were less arrests per team than there were before the policy. But, Your Honor, this policy created a drastic incentive structure to commit constitutional violations inside the home. Was it a quota? We allege it was a quota, Your Honor. We have to assume that that's true. What was the ramification for failure to meet it? Excuse me? What was the ramification for failure to meet the goal of quota? Your Honor, we don't know yet, absent discovery. But we allege it was a quota. And, interestingly, in a subsequent memorandum by Julie Meyer's successor, he says we shall no longer use a quota. But there's more to the policy. Okay. But you're at the point of trying to describe where the deliberate indifference is. Okay. Yes. We're unfortunately interrupting you. That's right. That's quite all right, Your Honor. And so, in addition to increasing the quota by 800 percent in the context of a home rate and with knowledge from an OIG report that said there was inadequate training. When was that report released? The report was issued in March 2007. But it's clear from the publication of the report that Julie Meyers had commented on the report. And so, therefore, it must have occurred long before 2007. You can't assume that the report was read before it was published. No. She responds in the report. And her responses are published in the report in March 2007. Okay. But it's March 2007. That's right. And so, once again, it's a subsequent publication. Your Honor, March 2007 is before four of the rates. But, nevertheless, as I've just explained, she had participated in this report clearly before because it's published with her comments. And that report tells her there's a 50 percent database inaccuracy rate and there's insufficient training. Then, she. Is that. This is all interesting. But I guess what you're trying to persuade us is that Bivens is a method for directing law enforcement policy. That this is bad policy. No, Your Honor. That Bivens individual lawsuits, personal damages lawsuits by plaintiffs are the way to direct the United States government in its law enforcement policy setting? No, Your Honor. All Bivens requires, and this is the question of qualified immunity, is that law enforcement officials do not act recklessly when they engage in policies. And so, now to get to the knowledge and acquiescence allegations. I think all of these policy decisions were reckless under Canton and the Carter case. And remember, in Carter, the court said failure to train officers in their obligation to tell the truth on the stand may result ex ante in liability. So, in that context, there's a. Assume we agree with you that, and I say we do or don't agree, that the policy of putting so many officers and not training them was an ill-conceived government idea to try and catch fugitives. Assume we agree with you that it was not a good idea. It's not good law enforcement. But, so that makes it not a good idea. They had a bad idea. But, does that mean that the people that were in charge of this idea of going forward intended, Bivens requires intent, intended as supervisors that there be unconstitutional searches at residences? Your Honor, so to connect these two thoughts, we believe that the policy as enacted produced a high degree of predictability of wrongdoing. And what triggers liability here is that when the wrongdoing actually occurs and the officers are repeatedly put on notice of that wrongdoing, that's what triggers liability. And so, if I go to the. Let's go a second here. Let's go a second to the policy. The policy wasn't, didn't the policy come from Congress? No, Your Honor. The memorandum as we allege came from. Congress is the one who provided the additional funding. At the request, the policy to increase the quota by 800% and then to count non-fugitives, that is persons inside a home, from Myers and Torres. Yes. And so, were you asking about the knowledge allegations? I sure was, because we're back to what's true here. Why don't you tell us how they were on notice? You say, boy, they were on notice over and over again. Mr. Scherer stands up and says, no, they weren't. Why don't you tell us specifically how they were on notice? Yes, Your Honor. In a number of ways, and these have, there's a quantitative and qualitative component. First, there were a number of press reports, including national press reports. Second, four lawsuits. About what? What were the press reports about? The press reports were, and we identify a number of them, including in the front page of the New York Times. Four statutes and dragging searches. Were there press reports that specifically alleged that the cases involving the nine plaintiffs who remain in this case involved illegal entries into their homes? Not the nine plaintiffs, but we don't have to show that on the Third Circuit Law, Your Honor. We just have to show knowledge of a pattern. So, in addition to the press reports, there were... What about Rody? What about Rody? Rody versus Della Cipriate said that Governor Thornburg and Attorney General Zimmerman weren't responsible, based on press reports. Well, Rody is, in part, why... You don't like Rody? Yes, Your Honor. Rody, I think, is plainly distinguishable because, in this case, it is their own policy, Myers and Torres, that they're implementing, and so would be on notice about failures regarding that policy. In Rody, the government, the governor is just... This is really Respondeat Superior. He is just a high-level official who happens to have complaints lodged in his office. Here, these policy officials are given direct notice. So, in addition to the lawsuits, I think in 2007, the notice becomes quite seriously elevated from a letter from the National Immigration Forum to Secretary Chertoff that Defendant Myers answers. Then, there is describing the exact same pattern of misconduct, we allege. Then, there is, a couple of months later, a letter from the Congressional Delegation of Connecticut, warning her again about barging into homes and treating children and women inappropriately. And then, there is the OIG report. Let's stop in Connecticut. Excuse me? Let's stop in Connecticut for a second. How can you attribute the misconduct in Connecticut to the ICE agents in New Jersey? Because, Your Honor, it's a national policy. There are the same fugitive operations. There was nothing in that policy that came from either Secretary Chertoff or Ms. Myers or anyone else, the other three defendants that said, in carrying out this policy, you should also burst through the doors, whether you have consent to come in or not. There was nothing that said that. You're right, Your Honor. And, when they learned that that was happening, that was when the duty triggered. But, they learned about it in Connecticut. They learned about it all over the country from the same command and control structure. If I am a supervisor and I have a policy that, as a result of my decision, harms people in California, and the exact same policy would affect people in New Jersey, I'm on notice. So, you don't see the connection between, I don't see the connection between policy. No, I agree with you that somebody at ICE developed the policy. The connection between policy and illegal conduct by ICE agents. When an ICE agent goes out and decides, you know what, we didn't get a yes, come on in, we're going in anyway, that's illegal conduct. I agree, Your Honor. And, I think that we've alleged that they produced an incentive structure that created a high degree of predictability of wrongdoing. And then, the predictability came to fruition. And, they were warned about it over and over and over again, including in the OIG report. So, it comes down to, would you agree that, to be plausible, that they knew there was a problem in New Jersey, it has to be the case that you have to have alleged sufficient facts to show these people knew what was going on in New Jersey. Right? We have to allege sufficient facts, taking all reasonable inferences in favor of the plaintiffs, to show that they could have known. We believe that they actually knew. It's that they had to have known. That's right. We have to show sufficient facts that they had actual knowledge, that is plausible. Assume that they did know that there were some ICE agents that were conducting illegal searches. Assume your facts are correct, that they knew that some ICE agents were doing this. How can we make the leap from that? Because you have a lot of FBI agents that occasionally do things which are improper. But, does that mean that every supervisor is responsible? Unless you have a situation where there's something where the supervisor is endorsing the conduct or approving the conduct in some way, but the mere fact that you have some lower level officers who are engaging in unconstitutional activity, how can we connect the dots from that conduct of the low level officer and say that the supervisor sitting in Washington with, what, in a state with several hundred agents intended that to be the case? Because Bivens requires that that federal agent intend that be the case. Your Honor, I disagree with the premise or the legal standard here. We don't have to show that they intended anyone to be harmed. We only have to show that they had knowledge of a prior pattern of misconduct. And the knowledge here goes directly to Myers and Torres from high level officials and from a government agency, the Office of the Inspector General. You're saying that so that if the FBI director knows that there have been some FBI agents that engage in improper conduct, that that's enough to hold the director responsible for the agent's conduct? Your Honor, it depends on the level of misconduct and the level of knowledge. And for pleading purposes, we have pled sufficient facts to show that Myers and Torres were on actual notice of a widespread pattern. Now, if I could add to this discussion. If they had actual notice, does that mean that they intended that conduct to have happened? They don't have to intend the conduct to have happened. They merely have to have known that it would happen and that it had some proximate cause to the ultimate outcome. And Judge Becker and Ms. Belovich. Where do you get that from Bivens? That's a causation requirement in Bivens. For example, in the Chinchella versus Fenton case, we talk about causation. And Judge Becker in the Belovich case says it is logical to assume and therefore, I think, plausible to assume that when a supervisor is told of repeated misconduct, that constitutes official tolerance of that misconduct. So for the pleading stage, we think all of this notice. So that's nationwide, you're saying. So you're saying if there are press reports or contact from Connecticut, from Texas, from wherever, that the conclusion necessarily is, I must have a problem in New Jersey. In addition to knowledge in New Jersey and that they get from New Jersey and where the policy is precisely the same. What's your knowledge? Yeah. I guess I'm going to have to ask you. Your assertions about knowledge and acquiescence then, you say, I guess you'd admit that they are dependent upon the conclusion that the policy itself was wrongful. No. No, Your Honor. It does not depend on the policy itself being wrongful. I keep reaching back to it and saying that, in fact, your very first answer to my question was you have to understand the knowledge in the context of the policy, which was, if I remember your answer, and I certainly know it from your briefing, was highly likely to lead to abuses. I mean, you've got to, one has to accept that this was inherently a flawed policy, right? One doesn't, Your Honor. It just heightens the idea that they were on knowledge because it was their policy. Or the plausibility of the knowledge, because it was their policy and because we believe it's, we allege and believe it was problematic in the first instance, but we do not have to prove it is. So problematic is not the same as flawed? Oh, it doesn't depend on it being flawed, Your Honor. It certainly doesn't depend on it being flawed. That is one part of our allegation, but we also allege knowledge and acquiescence. And I think that the knowledge becomes more plausible because it was their own policy that they themselves enacted, and they enacted in light of an OIG report that said there was insufficient training and high levels of inaccuracy. Mr. Razzi, I want to turn you to, and you've done an excellent job in establishing what the basis for your claim is here. But I want to turn you to the most recent Supreme Court pronouncement on this topic involving supervisors, and that's Iqbal. And you can argue what Iqbal says and it doesn't say and how it applies. And this is a Fourth Amendment case, and that was a First Amendment case. So there are some differences. But one thing that strikes me, and it's part of the supervisor's arguments on the request for qualified immunity, is that it says on 1949, absent vicarious liability, each government official, his or her title notwithstanding, is only liable for his or her own misconduct. Now, in reading that statement from Iqbal and understanding that the defendants in Iqbal were the Attorney General of the United States, the Director of the FBI, isn't it appropriate to read from this case that Supreme Court made a determination that unless supervisors are personally liable because of their own, they're liable because of their own misconduct, that they shouldn't be part of a case. That they're, to interfere with the operation of supervisors at certain levels, and the opposing counsel argues that Ms. Meyers is at least at the level of Mr. Mueller, so it's assumed for a second he was. How do you answer that? Your Honor, yes, Iqbal requires that supervisors be liable for their own misconduct. And it was dismissed in that case because there were no allocations of the state of mind required to state a claim for equal protection. And in our circuit, the same in the case of Ivanko versus Fisher. Oh, yeah, Your Honor, the pleadings here, I think, are much, much stronger. Yeah, those were frivolous pleadings, Your Honor, yes. But where knowledge is an element of the cause of action, as it is here, it is sufficient to plead knowledge in order to survive Iqbal. Iqbal was dismissed because the cause of action required to be pled under the Equal Protection Clause required proof of personal discrimination, and there were no non-conclusory allegations of personal discrimination. But immediately before that, I don't think you can totally dismiss, as somebody has said, the statement is that mere knowledge and equations, the Court says, we reject this argument. In the context of equal protection, where one has to show a discriminatory state of mind, it makes no sense to say — So that's your argument? Absolutely, Your Honor. And that's an argument that six circuit courts of appeals have now accepted, the first in Sanchez, the seventh in Grindel — Has anybody accepted the contrary? No, Your Honor, not that I'm aware of. And I would also underscore the citation to Dunlop, which I think also continues to support the idea that supervisory liability exists in the same way it existed before for non-intent-based claims. Well, even Justice Souter, in the dissent, said that the majority has done away with supervisory liability on a bill. I think we need to take that with a big grain of salt. I think people — Justice's dissent, perhaps for rhetorical reasons, and no one has followed Justice Stevens' analysis. He said that's the way he reads the majority opinion. Yes, but he — and he does that, I think, for some rhetorical reasons. But nobody has followed Justice Souter and the best reading of Iqbal in light of the citation to Dunlop, which says supervisory liability still exists where a supervisor fails to meet his duty of care. And in the Third Circuit, that duty of care still turns on knowledge and acquiescence. Does Iqbal say that you've got to make it — your negative conclusion more plausible than the positive conclusion? No, I don't think so, Your Honor. I think that's very, very important in order to evaluate the government's argument, the defendant's argument. We do not — Iqbal requires us only to plead our case, not to prove it. It's not a probability requirement. So the fact that there may be an alternative explanation that is plausible does not defeat the plausibility of our claim. And that, in fact, is the matrix decision decided unanimously by the Supreme Court two weeks ago. We provided a 28-J letter to that effect. In that case, nine justices thought the possibility, even under heightened pleading standards, that there were another plausible explanation for the defendant's conduct would not defeat the plausibility of the plaintiff's allegations. And in light of that standard, we believe we've amply met our pleading obligations. All right, Mr. Razzani, we thank you. And we'll have Mr. Shurer back for rebuttal. For your two minutes of rebuttal. The matrix decision was a very narrow decision regarding securities law. And I would ask the Court to clearly read that decision regarding what was some sort of statistical significant sample of adverse reactions or events that apply solely in FDA and SEC-type pleading. And the United States filed an amicus brief. The Court cites to the United States amicus brief favorably in several places there. I don't think matrix has anything to do with the pleading here. The OIG report, which plaintiffs heavily rely on, encourage the Court to read it, has nothing to do with, does not say that there is inadequate training. It states all the training that there is and makes only one suggestion, that there be a refresher course for agents. It notes the amount of training agents get in constitutional law, et cetera, with respect to these kinds of operations. And that's the only comment made there. So to the extent plaintiffs in their complaint, their second amended complaint, allege things, they allege things that actually support the lawfulness of the conduct here. The policy is lawful, they don't dispute that. The OIG report in nowhere states that these FOT operations are conducted unconstitutionally and makes no comment about that. And indeed, as I said, simply reinforces the statement with respect to that there is training on constitutional aspects of conducting these operations. I think the Rohde decision is an excellent decision with respect to what actually constitutes notice. And I would urge the Court to note there in the legislation, complaints to various offices, et cetera. There was a widespread press report, et cetera. None of that constituted notice for the Court, and I think the Court made that absolutely clear. On the issue... Let me ask you a very specific question, if I might. If we were to agree with you and say these supervisors, there's just not enough blood at this time, and it had to be dismissed, would that be a dismissal without prejudice since further information might emerge in the course of the litigation against the officers who are on the scene? Well, we would hope it would be with prejudice. I think following Iqbal... What's the basis for saying with prejudice? Because Iqbal makes it clear that plaintiffs have an obligation to plead. When they fail to do that, they are subject to a motion to dismiss, and that should end the case with respect to the supervisors. We're not talking here about the line agents. Right. And... And if the basis for rejection is the one you've pressed, which is these are conclusory allegations, there's insufficient factual basis, and they are able to develop a factual basis, should they be permitted to bring their claims? I would say no. And I think Iqbal, following on Harlow versus Fitzgerald, talks about the balance and the weighing that must go into having supervisors adequately do their job without fear of lawsuits. And on the other hand, the efforts that... The effort is to allow individuals who are injured some sort of remedy. In this situation, to allow, I would argue, the supervisory defendants to be dismissed without prejudice so that they can be brought in again, derails or detracts from their ability to do their jobs as they're required to do, and is on the side of the scales in which I think Iqbal and Harlow versus Fitzgerald say the courts ought to be very clear to protect the federal officials in these situations. Remember, this is not a case where plaintiffs have no remedies. Their remedy, they have an injunction action in official capacity, and they have actions that are still proceeding against the line agents. This is a question of supervisory effectiveness, the effectiveness of supervisors. We don't have to rule on the... We don't have to reach the pendant appellate jurisdiction though, is that correct? That's correct, if you rule in our favor on the qualified immunity. One of the possible easy ways to look at this, if I may, is that if the court wanted to look at it in its simplest way, Weber and Rodriguez, there are no allegations of notice for them. Torres and Myers, there's no personal jurisdiction for the reasons we've set forth. This is a national program, not enough to support personal jurisdiction, and failure to act certainly shouldn't be a basis for claiming that they availed themselves of the jurisdiction so as to require personal jurisdiction. Certainly, the Supreme Court and other courts, the ones we pointed out in our opening briefing regarding the Bureau of Prisons and Secret Service, make clear that the supervision of a national program should not be the basis. Mr. Scheer, thank you very much. And we want to thank both counsel for excellent arguments and on a very important case, and we'll take the matter under advisement.